**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
ALLENTOWN DIVISION**

| | |
|---|---|
| **LUTRON ELECTRONICS CO., INC.**, a Pennsylvania corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>**LEETRONICS CORPORATION**, a New York corporation, **ELIRAN YADID**, a natural person, and JOHN DOES 1-10, individually or as corporations/business entities,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

   Plaintiff Lutron Electronics Co., Inc. ("Plaintiff" or "Lutron") brings this action against Defendants Leetronics Corporation, Eliran Yadid, and John Does 1-10 (collectively, "Defendants") for:  (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);(3) common law unfair competition; (4) unfair trade practices in violation of 73 P.S. § 201; and (5) tortious interference with existing business relationships.  These claims arise from Defendants' misappropriation of Lutron's Trademarks in connection with Defendants' unlawful and unauthorized online sale of non-genuine products bearing Lutron's trademarks on the Internet.  Lutron dedicates considerable time and resources to ensure that consumers receive high quality Lutron products; Defendants sell products that are not subject to, do not abide by, and interfere with Lutron's quality controls – and thus are materially different from genuine Lutron Products – undermining Lutron's efforts and damaging the Lutron brand.  Lutron seeks both damages and injunctive relief in this Complaint and alleges as follows:

## PARTIES

1.    Lutron is a corporation organized under the laws of Pennsylvania, with its principal place of business located in Coopersburg, Pennsylvania.

2.    Leetronics Corporation ("Leetronics") is a corporation organized under the laws of New York.  According to corporate documents filed with the New York Department of State, the principal place of business of Leetronics is located in Brooklyn, New York.  Leetronics operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "Fannys Gifts" (the "Amazon Storefront").  The Amazon Storefront can be accessed at https://www.amazon.com//sp?seller=A1Q339Q3I0J2ZN.  Leetronics does business throughout the United States through the Amazon Storefront, including in Pennsylvania.[1]

3.    Eliran Yadid ("Yadid") is a natural person who, upon information and belief, resides at 578 Mayfair Drive S., Brooklyn, NY 11234.

4.    Corporate documents that have been filed for Leetronics identify Yadid as the chief executive officer of Leetronics and do not identify any other individuals as directors or officers of Leetronics.  Accordingly, upon information and belief, Yadid is in control of, a principal of, and primarily responsible for the actions of Leetronics and assists in the operation of the Amazon Storefront and does business throughout the United States through the Amazon Storefront, including in Pennsylvania.

5.    Lutron asserts claims against Yadid in his individual capacity and in his capacity as a corporate officer of Leetronics.

---

[1] As of the time of filing, Defendants' Amazon Storefront is called "Fannys Gifts."  Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time, even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is A1Q339Q3I0J2ZN.  Even if Defendants change the name of their Amazon Storefront at some time in the future, their storefront can always be accessed at the link in Paragraph 2 that includes the storefront's Merchant ID number.

6.     Alternatively, as the chief executive officer of Leetronics and sole corporate officer of Leetronics, Yadid directs, controls, ratifies, participates in, or is the moving force behind the acquisition and sale of infringing products bearing Lutron's trademarks by Leetronics.  Upon information and belief, Yadid personally participates in the acquisition and sale of infringing products by Leetronics.  Accordingly, Yadid is personally liable for infringing activities carried out by Leetronics without regard to piercing the corporate veil.

7.     Alternatively, upon information and belief, Leetronics follows so few corporate formalities and is so dominated by Yadid that it is merely an alter ego of Yadid.  Accordingly, Lutron is entitled to pierce the corporate veil of Leetronics and hold Yadid personally liable for the infringing activities of Leetronics.

8.     Lutron believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise, of these individuals or entities are unknown to Lutron.  Therefore, Lutron sues these defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Lutron will seek leave to amend this Complaint accordingly.  If Lutron does not identify any such parties, it will dismiss these defendants from this action.

## **JURISDICTION**

9.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Lutron's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Pennsylvania are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

10.    This Court has personal jurisdiction over Defendants because they have directed tortious activities toward the State of Pennsylvania and established sufficient minimum contacts with Pennsylvania by, among other things, advertising and selling substantial quantities of infringing products bearing Lutron's Trademarks to consumers within Pennsylvania through a highly interactive commercial website, with knowledge that Lutron is located in Pennsylvania and is harmed in Pennsylvania as a result of Defendants' sales of infringing products to Pennsylvania residents.  In particular, Defendants have:  (1) transacted business in Pennsylvania; (2) contracted to supply products in Pennsylvania; (3) shipped merchandise directly or indirectly into or through Pennsylvania; (4) stored infringing products in Pennsylvania; (5) caused harm or tortious injury by acts or omissions in Pennsylvania; and (6) caused harm or tortious injury to Lutron in Pennsylvania.

11.    Defendants' activities in Pennsylvania have been significant, as Defendants have made and continue to make substantial and regular sales of infringing products bearing Lutron's Trademarks to customers in Pennsylvania.  Defendants continue to do so despite being notified of their illegal conduct, its impact on Lutron in Pennsylvania, and the impendency of this action.

12.    Defendants' sales of infringing products bearing Lutron's trademarks into Pennsylvania have included, but are not limited to, a sale of an infringing product to Lutron in Pennsylvania.  Defendants structure their sales activity to invite consumers from Pennsylvania to purchase from Defendants' Amazon Storefront, and on or around April 14, 2023 Defendants caused one infringing product bearing Lutron's trademarks to be delivered to Lutron in Pennsylvania after the product was purchased from Defendants' Amazon Storefront.  In addition to their sale to Lutron, Defendants have also sold, and continue to regularly sell, a high volume of

other infringing products bearing Lutron's trademarks into Pennsylvania to other Pennsylvania residents.

13.     This Court also has personal jurisdiction over Defendants because infringing products bearing Lutron's Trademarks that they sell are stored within Pennsylvania before they are purchased by residents of Pennsylvania.  *See* ¶¶ 140-148, *infra*.

## VENUE

14.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Lutron & Its Trademarks

15.     Lutron markets and sells high-quality lighting control products, including products under the LUTRON®, AURORA®, CASÉTA®, CLARO®, DIVA®, MAESTRO®, NOVA®, SKYLARK®, and TOGGLER® brand names ("Lutron products").  Lutron allows its products to be sold to end-user consumers in the United States only by sellers who are expressly authorized by Lutron to sell Lutron products ("Authorized Sellers").

16.     Lutron allows Authorized Sellers to sell Lutron products only in approved channels and requires Authorized Sellers to abide by policies and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Lutron Rules").

17.     Lutron devotes significant time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By allowing end-user consumers to purchase Lutron products only from Authorized Sellers who are required to follow the quality controls and other

requirements in the Lutron Rules, Lutron ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of the Lutron family of brands.  In the highly-competitive lighting controls market, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

18.     To promote and protect the Lutron brands, Lutron has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: LUTRON® (U.S. Trademark Reg. Nos. 5068494, 4133948, 4133947, 3079420), AURORA® (U.S. Trademark Reg. No. 73439098), CASÉTA® (U.S. Trademark Reg. Nos. 4638318, 4638316), CLARO® (U.S. Trademark Reg. No. 1923363), DIVA® (U.S. Trademark Reg. No. 1832675), MAESTRO® (U.S. Trademark Reg. Nos. 5926079, 1831205), NOVA® (U.S. Trademark Reg. No. 1088064), SKYLARK® (U.S. Trademark Reg. Nos. 5926079, 1472979), and TOGGLER® (U.S. Trademark Reg. No. 1833748) (collectively, the "Lutron Trademarks").

19.     The registration for each of the Lutron Trademarks is valid, subsisting, and in full force and effect.

20.     Lutron's right to use the Lutron Trademarks has become incontestable under 15 U.S.C. § 1065 because such Lutron Trademarks have been in continuous use, Lutron received no final legal decision issued against such Lutron Trademarks, and Lutron timely filed a Section 15 Declaration describing such Lutron Trademarks' use.  Accordingly, these Lutron Trademarks serve as conclusive evidence of Lutron's ownership of the marks and of its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

21.     Lutron actively uses, advertises, and markets the Lutron Trademarks in commerce throughout the United States.

22.     Consumers recognize the Lutron Trademarks as being associated with high-quality lighting control products.

23.     Due to the quality and exclusive distribution of Lutron's products, and because Lutron is recognized as the source of high-quality products, the Lutron Trademarks have considerable value.

**Online Marketplaces and the Challenge They Present to Lutron Product Quality**

24.     E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.7%.  *E-Commerce Retail Sales as a Percent of Total Sales*,  Federal  Reserve  Bank  of  St.  Louis  (February  17,  2023), https://fred.stlouisfed.org/series/ECOMPCTSA.

25.     In 2022, United States consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021.  *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce  360  (February  17,  2023),  https://www.digitalcommerce360.com/article/us-ecommerce-sales/.  The massive growth in e-commerce is being driven in part by sales on online marketplaces.  For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

26.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

27.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products

before purchasing them.  Instead, consumers must trust that the product they receive from an online seller will be authentic and of the quality they expect and typically receive from the manufacturer.

28.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized means – typically referred to as "diversion" – can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

29.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers on online marketplaces to sell diverted products that, because of the lack of quality controls, may be of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990; *see also* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

30.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance

Committee issued a bipartisan report on the issue, finding that as e-commerce has grown, products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms and that such sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

31.     In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon also admitted that third-party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See Amazon.com, Inc., Annual Report (Form 10-K) at 8 (Feb. 3, 2021), available at https://ir.aboutamazon.com/sec-filings/default.aspx; Amazon.com, Inc., Annual Report (Form 10-K) at 8 (Feb. 4, 2022), available at https://ir.aboutamazon.com/sec-filings/default.aspx.*  Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

32.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

33.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

34.     The design of many online marketplaces causes consumers to mistakenly believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, regardless of how many sellers offer a particular product, Amazon maintains a single product listing for such product.  That product listing states "By [name of brand]" immediately under the title of the product and lists all sellers of that product on the same listing, even though many of those sellers are unauthorized and have no relationship with the brand owner.

35.     For all these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.  When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

36.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

37.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such

reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

38.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family.  Jamie Pitman, *Local Consumer Review Survey 2022*, BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.  The mere presence of reviews on an online product page can also increase purchase rates by up to 270% when compared to product pages that do not display reviews.  Tom Collinger, *How Online Reviews Influence Sales*, NORTHWESTERN UNIVERSITY, https://spiegel.medill.northwestern.edu/how-online-reviews-influence-sales/.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  *See* FTC news release, June 4, 2019 (available at: https://www.ftc.gov/legal-library/browse/cases-proceedings/172-3113-cure-encapsulations-inc (last accessed 7/24/23).)

39.    Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html. According to one study, 85% of consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-

11

Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and perceived to be particularly accurate in describing a product's quality.

40.    Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.  For all these reasons, negative online reviews can be the death knell for a manufacturer's online product listings.

**Lutron's Reputation and Goodwill Have Been Harmed by Numerous
Online Reviews Written by Consumers Who Purchased
Products from Unauthorized Sellers on Online Marketplaces**

41.    Consumers who purchase from unauthorized sellers on online marketplaces frequently receive used or damaged products or poor quality customer service and leave negative reviews on the product listing.  These negative reviews can injure consumer perceptions of the brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

42.    Numerous consumers have written negative reviews of Lutron products being offered for sale on Amazon by unauthorized resellers.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Lutron products low "ratings" and complained of receiving products that were missing parts, broken, used, defective, and different in appearance from what had been advertised.

43.    For example, Defendants have sold on Amazon the Lutron product seen in the screenshot below:



44.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were previously used, tampered with, or already installed.







45.     Below is a screenshot of another Lutron product that Defendants have sold on Amazon:



46.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving the wrong or a previously used product:







47.     Below is a screenshot of another Lutron product that Defendants have sold on Amazon:



48.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that arrived open, used, or damaged, or products that did not function properly:









49.     The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Lutron products listed on Amazon that Defendants sell through their Amazon Storefront.   These reviews hurt Lutron's brand as consumers view and rely on these reviews, even when purchasing Lutron products offline.

50.     Amazon does not allow product reviews to identify the seller of the product that is the subject of the review.   Given that Defendants are selling a high volume of products bearing the Lutron Trademarks on Amazon and are not subject to Lutron's quality controls, it is likely that some of the foregoing negative reviews—and the many similar reviews of Lutron products that

appear on the Amazon website—were written by customers who purchased products bearing the Lutron Trademarks from Defendants.  Even when the text of a review makes clear that the problem was seller-caused, it will lower the Lutron product's average review score and may affect search placement.

**Lutron Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented by Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect from Lutron**

51.    The above reviews show how sales of poor-quality Lutron products disappoint Lutron's consumers and cause significant harm to the reputation and goodwill of Lutron and its brands.  To protect itself and consumers from these harms, Lutron implemented a quality control program that applies to all its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

52.    The goal of Lutron's quality control program is to ensure that consumers who purchase Lutron products, including consumers who buy online, receive the high-quality products and services they have come to expect from the Lutron brand name.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Lutron Trademarks.

53.    Lutron abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

54.    Lutron's quality controls begin with requiring that all outside sales of its products take place through Lutron's Authorized Sellers.  This basic step ensures that all of Lutron's authorized sales are subject to Lutron's quality control requirements.

55.    The Lutron Rules also require Authorized Sellers to purchase Lutron products only from Lutron directly or from other Authorized Sellers.  This restriction ensures that the chain of custody can be established for all Lutron products sold to consumers by Authorized Sellers and

thus prevents unsafe products, secondhand goods, or other low quality products from entering into the distribution chain.

56.     The Lutron Rules also limit to whom and where Authorized Sellers may sell Lutron products.  To prevent persons outside of Lutron's quality controls from acquiring and reselling Lutron products, the Lutron Rules prohibit Authorized Sellers from selling Lutron products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are permitted to sell Lutron products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

57.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also prohibited from selling Lutron products on any website they do not themselves own and operate unless they first apply for and receive written approval from Lutron.

58.     These restrictions are essential to Lutron's ability to exercise its quality controls over Lutron products because they prevent unauthorized sellers from obtaining and reselling Lutron products and allow Lutron to know where all its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Lutron can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Lutron is unable to take such action against unauthorized sellers because it does not know who those sellers are and thus cannot obtain their cooperation in addressing any product quality issues that may arise.  While the recent Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act ("INFORM Consumers Act," 15 U.S.C. § 45f) requires Amazon to identify seller contact information, much of the information that has been made available is unreliable, falsified, or simply incorrect.

59. In addition to restricting where and how Authorized Sellers can acquire and sell Lutron products, the Lutron Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Lutron products.

60. To ensure that customers receive the genuine and high-quality products they expect from Lutron, the Lutron Rules require Authorized Sellers to inspect all Lutron products for any damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Authorized Sellers are prohibited from selling damaged or defective products, and are required to report any discovered defects to Lutron to assist it with identifying any product quality issues.

61. The Lutron Rules also require that Authorized Sellers store Lutron products in accordance with guidelines issued by Lutron.  This requirement helps ensure that Lutron products are stored properly and are not damaged prior to being shipped to the consumer.

62. To avoid consumer confusion and ensure that customers receive genuine Lutron products, Authorized Sellers must sell Lutron products in their original packaging and are prohibited from relabeling, repackaging, or altering Lutron products or any accompanying label, literature, or safety-related information, unless instructed by Lutron.  Authorized Sellers are prohibited from reselling any Lutron products as "new" that have been returned, opened or repackaged.

63. Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Lutron products, including any serial number, UPC code, QR code, or other identifying information.

64. The Lutron Rules give Lutron the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Lutron products to ensure their compliance with

Lutron's quality control requirements.  Authorized Sellers also must cooperate with Lutron with respect to any product recall or other consumer safety information dissemination effort conducted by Lutron regarding Lutron products, including by swiftly providing Lutron with all information regarding sales of any Lutron products that are subject to any recall.

65.     The Lutron Rules also require Authorized Sellers to provide various customer services to their customers.

66.     For example, Authorized Sellers must familiarize themselves with the features of all Lutron products kept in their inventory so that they can advise customers on the selection, installation, and safe use of Lutron products, offer ongoing support to consumers, and promptly respond to consumer inquiries before and after the sale of genuine Lutron products.  Further, in any display of Lutron products, Authorized Sellers must display complete, accurate, and up-to-date product information to allow consumers to make fully-informed decisions based on product names, serial numbers, and features, specifications, functionality, and compatibility.

67.     Lutron's quality control and customer service requirements are legitimate and substantial and have been implemented so that Lutron can control the quality of goods manufactured and sold under the Lutron Trademarks, to protect consumers as well as the value and goodwill associated with the Lutron Trademarks.

68.     Lutron's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Lutron product that they were considering buying was being sold by an Authorized Seller who is subject to Lutron's quality control and customer service requirements, or whether

the product is being sold by an unauthorized seller who does not abide by Lutron's quality controls and over whom Lutron is unable to exercise its quality controls.

**Given the Flood of Poor-Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Lutron Imposes Additional Requirements on Its Authorized Sellers Who Sell Online**

69.     As shown in the consumer reviews cited above (¶¶ 42-49, *supra)*, Lutron products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product-listing page.

70.     Given these heightened risks to consumer satisfaction and the value of its Lutron Trademarks that are posed by online sellers, Lutron imposes additional quality control requirements on all of its Authorized Sellers who sell Lutron products online.

71.     The Lutron Rules allow Authorized Sellers to sell certain Lutron products through "Permissible Public Websites," "Permissible Gated Websites," and "Authorized Websites."  These rules allow Lutron to oversee all Authorized Sellers who sell Lutron products online.

72.     A "Permissible Public Website" is a website that:  (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name; (2) is not a third-party storefront on an online marketplace; and (3) lists the Authorized Seller's mailing address, telephone number, and email address.

73.     A "Permissible Gated Website" is a website that has received Lutron's written consent to list certain Lutron products for sale and:  (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name; (2) is established for the sole purpose of business-to-business product sales; (3) has the primary goal of supporting end-users

who are professional tradesmen; and (4) requires a direct, verified end-user account to access a secure online-ordering system.

74.     Authorized Sellers must receive prior written approval from Lutron before they can sell Lutron products on any website that does not meet the criteria of a Permissible Public Website or Permissible Gated Website (collectively "Permissible Website(s)").  To obtain such prior approval from Lutron, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Lutron products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Lutron that includes review of their business operating record and online review history.  A website that Lutron permits an Authorized Seller to use through this process is called an "Authorized Website."

75.     The Lutron Rules impose numerous additional requirements on Authorized Sellers who sell Lutron products on Permissible Websites or Authorized Websites (collectively, "Authorized Online Sellers").

76.     For example, Authorized Online Sellers must use images of Lutron products provided or approved by Lutron and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Lutron product they do not carry in inventory.

77.     The Lutron Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Lutron or another third party.  These requirements allow consumers of Lutron products to understand the nature of the seller from whom they are purchasing and contact the seller if any quality issues arise. These requirements also allow Lutron to protect the public from the sale of poor-quality and used

Lutron products because it allows for easy detection of any online seller that may sell poor-quality or used goods.

78.     Authorized Online Sellers who sell Lutron products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Lutron.  At Lutron's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Website or Authorized Website where Authorized Online Sellers are selling Lutron products.

79.     Unless otherwise approved by Lutron, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Lutron products.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive Lutron products from other sellers' product stock when they purchase from Authorized Online Sellers.  When fulfilling online orders, Authorized Online Sellers must also select a box and packing materials that will cause the least amount of product movement during shipment and take any other precautionary steps reasonably necessary to ensure Lutron products are packaged in a manner so as to prevent against any damage to the products during transit.  These requirements ensure that the specific products that the Authorized Online Seller has, that meet Lutron's quality standards, will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Lutron's quality controls.

80.     All websites where Authorized Online Sellers sell Lutron products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also:  (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and

their responses; (ii) provide this information to Lutron upon request; and (iii) cooperate with Lutron in investigating negative online reviews related to sales of Lutron products.

81.     The additional quality control requirements that Lutron imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Lutron to carefully control the quality of Lutron products that are sold online and quickly address any quality issues that arise.

82.     Lutron's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Lutron products online receive genuine, high-quality Lutron products that abide by Lutron's quality controls.  Consumers purchasing Lutron products online would find it relevant to their purchasing decision to know whether the product they are buying is sold by an Authorized Online Seller who is subject to, and abides by, Lutron's quality controls.

### Lutron Monitors and Audits Its Authorized Online Sellers to Ensure They Comply With Its Quality Control Requirements

83.     Lutron regularly audits its Authorized Online Sellers and monitors Authorized Websites and Permissible Websites to ensure that Authorized Online Sellers are adhering to Lutron's quality control requirements.  Lutron carries out its auditing and monitoring actions pursuant to an internal program called the Lutron Electronics Co., Inc. Online Quality Control Program ("Auditing Program").

84.     As part of its Auditing Program, Lutron examines a rotating sample of Authorized Websites and Permissible Websites to ensure that the Authorized Online Sellers who sell through the websites are complying with the Lutron Rules.  During these examinations, Lutron checks to make sure that, among other requirements, Authorized Websites and Permissible Websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name

and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Lutron or a third party; (iii) do not display any content that could be detrimental to Lutron or its brands; (iv) do not make any representations regarding Lutron products that are misleading; (v) exclusively contain images of Lutron products and product descriptions that are supplied or authorized by Lutron and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

85.     Lutron also periodically inspects online reviews of Lutron products and Authorized Online Sellers that appear on Authorized Websites and Permissible Websites.  If Lutron discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality Lutron products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Lutron communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of the negative reviews, if possible.

86.     Lutron also conducts purchases of Lutron products from a rotating sample of Authorized Websites and Permissible Websites.  If Lutron discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites and Permissible Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Lutron communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

87.     If Lutron discovers that an Authorized Online Seller is selling Lutron products of poor quality or otherwise not adhering to Lutron's quality control or customer service

requirements, Lutron conducts an investigation to determine the source of the problem.  The Lutron Rules require that Authorized Online Sellers cooperate with Lutron's investigation, permit Lutron to inspect their facilities and records relating to Lutron products, and disclose all information about where they obtained Lutron products.  Based on what its investigation reveals, Lutron has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Lutron products.

**Genuine Lutron Products Come With Lutron's Limited Warranties;
Products Sold by Defendants Do Not**

88.     Genuine Lutron products purchased from Lutron's Authorized Sellers come with the Lutron's Limited Warranties (the "Lutron Warranties").

89.     The Lutron Warranties warrant Lutron products against defects in manufacturing under normal use for the applicable warranty period, subject to the conditions contained therein. The warranty period depends on the Lutron product at issue and the level of coverage selected by the customer, but lasts, at minimum, for one year from the date of purchase.

90.     Under the Lutron Warranties, a customer can receive a product repair or replacement.   The complete statements for the Lutron Warranties can be viewed at https://assets.lutron.com/a/documents/369-119_wallbox_warranty.pdf   and   are   incorporated herein.

91.     Lutron extends the Lutron Warranties only to products that were sold by sellers who are subject to Lutron's quality controls.  Because products sold by unauthorized sellers are not subject to Lutron's quality controls and Lutron cannot ensure the quality of such products, the Lutron Warranties do not cover Lutron products sold by unauthorized sellers, including Defendants.  For consumers to obtain benefits under the Lutron Warranties, they must submit a proof of purchase showing that they purchased their product from an Authorized Seller.

92.     The Lutron Warranties are a material component of genuine Lutron products. Consumers considering whether to purchase Lutron products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Lutron Warranties.

**Defendants Are Not Authorized Sellers and Are Illegally Selling
Non-Genuine Products Bearing the Lutron Trademarks**

93.     Because the unauthorized sale of Lutron products over the Internet threatens the reputation and goodwill associated with the Lutron Trademarks, Lutron actively monitors the sale of its products online.

94.     In the course of this monitoring, Lutron discovered that high volumes of products bearing the Lutron Trademarks were being illegally sold by Defendants on Amazon through a storefront called "Fannys Gifts."

95.     Through investigation, Lutron identified Defendants as the operators of the "Fannys Gifts" storefront and the parties who are responsible for the unlawful sale of products bearing the Lutron Trademarks through the "Fannys Gifts" storefront.

96.     Defendants are not Authorized Sellers of Lutron products and are not subject to, and do not comply with, the Lutron Rules or the quality controls that Lutron imposes on its Authorized Sellers.

97.     On February 21, 2023, counsel for Lutron sent a cease-and-desist letter to Yadid and Leetronics via email and overnight mail.  The letter explained that Defendants are infringing the Lutron Trademarks by selling products through their Amazon Storefront that are materially different from genuine products sold by Lutron's Authorized Sellers and that are not subject to, do not abide by, and interfere with Lutron's quality controls.  The letter also explained that Defendants are tortiously interfering with Lutron's contracts by purchasing products from Authorized Sellers,

who are prohibited from selling products to persons or entities who are not Authorized Sellers and resell the products.  The letter also informed Defendants that Lutron is located in Pennsylvania, is harmed in Pennsylvania as a result of Defendants' illegal sales of infringing products bearing the Lutron Trademarks, and that Defendants would be subject to personal jurisdiction in Pennsylvania if they continued to engage in their illegal conduct and Lutron filed suit.  Lutron's letter demanded that Defendants permanently cease selling products bearing the Lutron Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

98.    Lutron sent additional cease-and-desist letters to Yadid and Leetronics by email and overnight mail on March 6, 2023 and April 14, 2023 that repeated the demands in Lutron's February 21, 2023 letter.  Lutron's April 14, 2023 letter also enclosed a draft complaint against Defendants that was prepared for filing in the United States District Court for the Eastern District of Pennsylvania.

99.    As of the time of filing, Defendants have not responded to any of Lutron's letters and have continued to advertise and sell products bearing the Lutron Trademarks through their Amazon Storefront without any abatement.  Defendants' disregard of Lutron's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

100.    Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Lutron Trademarks through their Amazon Storefront.  Monitoring software estimates that Defendants have sold more than 2,500 infringing products through their Amazon Storefront for revenue in excess of $68,000.

101.    Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from Pennsylvania residents for products

bearing the Lutron Trademarks and cause substantial quantities of infringing products bearing the Lutron Trademarks to be shipped to persons located in Pennsylvania through the regular course of business.

**Defendants Are Infringing the Lutron Trademarks by Selling Products Bearing the Lutron Trademarks That Are Not Subject to, Do Not Abide by, and Interfere With Lutron's Quality Control and Customer Service Requirements**

113.    Defendants, without authorization from Lutron, have sold—and are continuing to sell—products bearing the Lutron Trademarks through their Amazon Storefront.  Defendants may also be selling products through additional channels that Lutron has not yet discovered and cannot discover until it is able to take discovery.

114.    Lutron has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not genuine Lutron products because they are not subject to, do not abide by, and interfere with Lutron's quality control and customer service requirements that Authorized Sellers must follow.

115.    Lutron's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Lutron has lost control of the quality of goods that bear its Lutron Trademarks.

116.    Defendants do not abide by Lutron's quality control requirements because they have not provided Lutron with their business information, nor given Lutron an opportunity to vet them to determine if they meet Lutron's high standards for what it demands of its Authorized Sellers who sell Lutron products on Authorized Websites.  Instead, Defendants sell products online without Lutron's authorization or oversight.

117.    Defendants do not comply with Lutron's quality control requirements—and interfere with Lutron's quality controls—because they have not disclosed to Lutron where they sell Lutron products online.  Defendants also do not provide customer feedback to Lutron that relates to their sales of products bearing the Lutron Trademarks or cooperate with Lutron in investigating negative online reviews relating to their sales of products bearing the Lutron Trademarks, as Authorized Online Sellers are required to do.  These actions prevent Lutron from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Lutron Trademarks.

118.    Defendants also do not comply with Lutron's quality control requirements—and interfere with Lutron's quality controls—because they:  (1) have not disclosed to Lutron where they acquire products that bear the Lutron Trademarks; and (2) have not given Lutron the right to audit and inspect their facilities and records.  As a result, among other things, Lutron cannot know if Defendants are:  (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling products with quality issues caused by their handling; (iii) selling products only in official and unaltered Lutron packaging; (iv) improperly allowing products that have been returned or repackaged to be listed as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers.  Lutron also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

119.    Customers have written numerous reviews of Defendants' Amazon Storefront in which they complained of exceptionally poor service from Defendants and of receiving products that were tampered with, not sealed, previously used, damaged, very old, and counterfeit:

★☆☆☆☆    "My package was delivered nicely by Amazon. Seller is the issue. Box looked open but I didn't notice anything until I looked at the blade and the blade was cracked and missing a tooth."
Read less
By Lea Buuck on June 25, 2023.

★☆☆☆☆    "The box it's incredibly damaged with holes and ripped apart. Spray is half empty. Really disappointed in the quality."
By K R on June 16, 2023.

★☆☆☆☆    "Very disappointed you sent a used paddle but sold as new. Will never trust this vendor again"
By Dissatisfied on June 10, 2023.

★☆☆☆☆    "It was used item with animal hairs."
By Amazon Customer on June 10, 2023.

★☆☆☆☆    "These clippers have been used. The oil was open and there is hair in the clippers. I didn't order used one for the price I paid"
By DANA C. on June 9, 2023.

★☆☆☆☆    "This item is not new, the battery was already installed and have finger prints all over, plus it is very difficult to open cover. Most likely the reason it was returned. Then you sell it to me as new.. I am not happy, why is it so hard to just do the right thing?!.."
Read less
By I TELL U THE TRUTH on May 23, 2023.

    "This looks like it was repackaged? Not new?"
By Deb on February 18, 2023.

★☆☆☆☆    "First item they sent me came in a smashed up box and did not work. It also came late. A replacement is on its way and this one is also running late."
By DDS on February 17, 2023.

★☆☆☆☆    "Was given a clearly used product that had been rewrapprd with an already cut bag."
By Katelyn A on January 24, 2023.

"Had an issue with the item, and tried to contact the seller several times with no response from them. Even Amazon tried to contact them, but they finally replied one time and once I replied to that message..... well Ill just say I am still waiting on a response from them... Their customer service sucks and I would not recommend buying anything from them."
Read less

By Daniel Arnold on December 26, 2022.

"Package was open and empty. Nothing in envelope"

By claudia mukai on December 5, 2022.

"The item shipped was stained with a brown substance. It was shipped in this condition as the shipping envelope was in good condition. Whoever packed this item didn't care about the product they were shipping."
Read less

By Kindle Customer on November 15, 2022.

"Empty package was supposed to be 2 diffuser ack received empty mailer envelope won't deal with fannys gifts again"

By Amazon Customer on November 7, 2022.

"Took 17 days to receive 1 box of calming care. Shipped from NY to WI and to top it off the box was in a bubble envelope and smashed. Never again!!"

By The Cat's MEOW on November 5, 2022.

"I've sent numerous messages to the seller and still haven't heard back from them. I paid for two of the product and only received one. They RIP YOU OFF beware!"

By JHOOK on October 22, 2022.

"Item appeared not new/tampered with. Product packaging missing seal and interior instruction packet"

By A Thompson on October 1, 2022.

"I received an opened box, containing a cable, no battery or charger. Seller is either a con artist or completely negligent."
By LoWo on September 28, 2022.

"The box was not sealed and busted open."

By ChrizzySnow on September 2, 2022.

"Package distroyed pills all over the bag bottle and box crushed I won't be buying anymore"

By theodore lindner on August 12, 2022.

 terri

★☆☆☆☆

Reviewed on June 20, 2022

It was used

 Amazon Customer

★☆☆☆☆

Reviewed on June 14, 2022

order a new one..what i got was a used one , no instructions and covered in dog hair

★☆☆☆☆   "Received packet box open no pharmones-missing box busted open upon arrival unacceptable."

By mango on April 26, 2022.

★★★☆☆   "THE DIFFUSER WAS TAKEN OUT OF THE BOX AND THE TAPE WAS CUT ON THE OUTSIDE, WHEN I CHECKED TO SEE IF IT WAS A MANUFACTURERS MISTAKE OR JUST TAKEN OUT BY A OTHER CUSTOMER."
Read less

By Dutch girl on April 1, 2022.

★☆☆☆☆   "It looked used & box was taped shut & product sounded like it was sliding around in box. Didn't even open it. Returning it immediately"

By tammy on March 26, 2022.

★★☆☆☆   "This item looks used."

By Meantime1974 on March 14, 2022.

★☆☆☆☆   "This is a counterfeit bottle of cosequin. Do not buy from this seller. He is selling fake bottles of cosequin. Shame on Amazon for having this as the number one search result for cosequin under "amazons choice""
Read less

By Terpac on March 12, 2022.

★☆☆☆☆   "Item not new. Package was previously opened & not repackaged as if it was new. You could tell the remote had been opened. Case scratched. As of yet I don't if it works. Haven't had time yet to pair with opener."
Read less

By Gifford L. Ewers on February 17, 2022.

★☆☆☆☆   "Delivered the wrong product, promised to send the correct product, never did and stopped communicating. Certainly won't use this company again."

By julie dabbieri on February 5, 2022.

★★☆☆☆ "One of the four boxes of Feliway Optimum was empty. The bottom of the box was open. I don't have anything to return to Amazon, but the refund process requires a return. It also chose a return place (Whole Foods Market) that is really far away from my house. How can I return a missing item???"
Read less

By Bean Dip on January 24, 2022.

 "ITEM PACKAGE IS DAMAGE. WHICH IS A GIFT FOR MY DAUGHER"

By junwu on January 10, 2022.

★☆☆☆☆ "JUST A SCAM! STAY AWAY FROM THIS SHOP!!!! Ordered a NEW item, not used! Today I have received totally wrong item(not the type of spray I ordered!, halfway used(25% of the bottle empty), in the damaged box, which was meant to pretend to be "new" because the top of the box was unopened, while the bottom of the box was unsealed and broken; and the whole bottle is dirty, with oily fingerprints."
Read less

By Natalia O on December 14, 2021.

 "Item arrived used and damaged. Seller would not issue a refund."

By Jen on October 21, 2021.

★☆☆☆☆ "Sold as new. Boxes were all beat up with tape seals broken. One box was even open and products were loose in shipping bag. Contacted seller and got rude response. Boxes did not receive that damage in shipping. Poor seller."
Read less

By Linda M. on September 8, 2021.

 "Box was open, clearly used"

By Sara T. on August 20, 2021.

★☆☆☆☆ "i got the product and the box was sealed so i threw it up in the cabinet till i was ready to use it, but come to find out it had been used and the box had already been thrown away and now I'm out 75$ because I'm not using something on my face that someone else hands have been in"
Read less

By kesley gower on August 19, 2021.

★★☆☆☆ "One of the two arrived in a seriously damaged box that had been opened prior (obvious since hair was stuck under the seal that was sliced open). The product itself had been used, evident by comparison of liquid with the new one that was received. I don't have time to deal with an exchange… terrible seller to let this go out, especially when advertised as new. Buy from someone else!"
Read less

By Cindy V on August 17, 2021.

120. These reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefront, and they are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers on online

34

marketplaces.  Lutron allows its products to be sold only by Authorized Sellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

121.    The negative reviews of Defendants' Amazon Storefront, along with the numerous negative customer reviews on Amazon of Lutron products that Defendants have sold, *see supra* ¶¶ 42-50, show that Defendants are very likely not carrying out the quality-control inspection, storage, or handling requirements that Lutron requires Authorized Sellers to follow for Lutron products.  Instead, Defendants are likely selling products bearing the Lutron Trademarks to consumers that are damaged, not sealed, tampered with, previously used or installed, defective, missing components, or otherwise different from what had been advertised rather than removing such products from their inventory.  These sales cause customers to write highly negative reviews of Lutron products that harm Lutron's reputation and hurt the placement of Lutron products in search results.

122.    Defendants' failure to abide by the Lutron Rules prevents Lutron from exercising control over the quality of products Defendants sell bearing the Lutron Trademarks.  Unlike with its Authorized Online Sellers, Lutron cannot monitor or audit Defendants to ensure they are complying with its quality controls, or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

123.    Through their unauthorized use of the Lutron Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Lutron products.  In reality, however, the products that Defendants sell are materially different from genuine Lutron products—and are not genuine

products—because they are not subject to, do not abide by, and interfere with Lutron's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Lutron Trademarks by Selling Products Bearing the Lutron Trademarks That Do Not Come With the Lutron Warranties**

124.    As set forth above, genuine Lutron products purchased from an Authorized Seller come with the Lutron Warranties.  Lutron, however, does not extend the Lutron Warranties to products purchased from non-Authorized Sellers because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

125.    Because Defendants are not Authorized Sellers and are, thus, not subject to Lutron's quality control requirements, the products bearing the Lutron Trademarks that Defendants sell do not come with the Lutron Warranties.

126.    The Lutron Warranties are a material component of genuine Lutron products. Consumers considering whether to purchase Lutron products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Lutron Warranties.  Consumers who purchase Lutron products with the Lutron Warranties receive the peace of mind that they are receiving a high-quality product, that Lutron stands behind the product, and that if a defect occurs, they can get a product repair or replacement.

127.    Because the products Defendants sell do not come with the Lutron Warranties, they are materially different from genuine Lutron products and are not, in fact, genuine Lutron products.

128.    Defendants' unauthorized sale of non-genuine products bearing the Lutron Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Lutron Products that come with the Lutron Warranties when, in fact, they are not.

**Defendants Are Tortiously Interfering With**
**Lutron's Business Relationships With Its Authorized Sellers**

129.     As discussed, Lutron allows its products to be sold to end-user consumers only by Authorized Sellers.

130.     Lutron's Authorized Sellers are prohibited by the Lutron Rules from selling Lutron products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

131.     Defendants have sold and are continuing to sell a high volume of products bearing the Lutron Trademarks on the Internet.  Absent theft, the only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.   Accordingly, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

132.     By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Lutron.

133.     Defendants have known that Lutron's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, whom the Authorized Sellers know, or have reason to know, are going to resell the products.

134.     Defendants have known of this prohibition since approximately February 21, 2023. On that date, Lutron emailed and overnight mailed a cease-and-desist letter to Yadid and Leetronics explaining that Lutron has agreements with all of its Authorized Sellers that prohibit them from selling Lutron products to any person or entity that is not an Authorized Seller but intends to resell the products.

135.    Lutron's letter also informed Defendants that, by purchasing Lutron products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between Lutron and its Authorized Seller and interfere with Lutron's agreements and business relationships.

136.    Lutron's letter also advised Defendants that if they continued to acquire products from Lutron's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Lutron's contracts and business relationships with its Authorized Sellers.

137.    Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Lutron's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

138.    In interfering with Lutron's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Lutron products from Authorized Sellers —and in so doing, instigated a breach of Authorized Sellers' agreements with Lutron—so that Defendants could unlawfully infringe upon and materially damage the value of the Lutron Trademarks by reselling the products on the Internet, thereby committing an independent tort.

139.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Infringing Products Bearing the Lutron Trademarks That Defendants Are Selling Are Being Stored Throughout the United States, Including In Pennsylvania**

140.    Individuals and entities who wish to sell products through storefronts on Amazon must enter into a contract with Amazon.com Services LLC ("Amazon.com").

141.    Once a seller has entered into a contract with Amazon.com, the seller must choose whether it will:  (i) itself store and ship products; or instead (ii) pay ongoing fees to have

Amazon.com store the seller's products at "fulfillment centers" (*i.e.*, warehouses) operated by Amazon.com, and ship products to consumers once they have been purchased.  Amazon offers the second method of storage and fulfillment through a service called "Fulfillment By Amazon."

142.    When a seller chooses to use the "Fulfillment By Amazon" service, it retains ownership of the products it stores at Amazon fulfillment centers and can have Amazon.com ship products back to the seller before they have been purchased by customers.

143.    However, sellers who use the "Fulfillment By Amazon" are not able to control where Amazon.com stores such seller's products.  Sellers who use the "Fulfillment By Amazon" service must agree to "Fulfillment by Amazon Service Terms" set forth in their contract with Amazon.com.  These terms provide that Amazon can transfer sellers' products between fulfillment centers without notice or approval from sellers, although sellers are able to see—through their electronic Amazon accounts—where their products are currently being stored at any time.

144.    Amazon.com has more than 180 fulfillment centers spread around the United States, including at least one fulfillment center in almost every state.  Amazon also promises to customers that all product orders it fulfills—including products that third-party sellers sell to customers while using the "Fulfillment By Amazon" service—will be delivered within two days of purchase.  To live up to this promise, Amazon carefully distributes all products it stores for third-party sellers between its fulfillment centers all around the country to ensure products can be delivered within two days of purchase no matter where the order is placed in the United States.

145.    As a result, sellers who use Amazon.com's "Fulfillment By Amazon" service have their products stored all around the country by Amazon.com, including in Pennsylvania, where there are at least fourteen Amazon fulfillment centers.  *See* Pamela Sroka-Holzmann, *Amazon to Hire 1,000 Workers at New Pennsylvania Warehouse*, LEHIGH VALLEY LIVE (Sept. 29, 2020),

https://www.lehighvalleylive.com/allentown/2020/09/amazon-to-hire-1000-new-workers-at-new-pennsylvania-warehouse.html.

146.    Defendants are using Amazon.com's "Fulfillment By Amazon" service for all of the infringing products bearing the Lutron Trademarks they are selling through their "Fannys Gifts" storefront, as shown below (with highlighting):



147.    Based on these facts, along with the fact that Pennsylvania is a highly populous state, it is exceedingly likely that large quantities of products bearing the Lutron Trademarks owned by Defendants are being stored within Pennsylvania by Amazon.com before the products are purchased by residents of Pennsylvania.

148.    Defendants are intentionally using Amazon.com's vast, established infrastructure to sell and ship infringing products bearing the Lutron Trademarks to consumers nationwide, including customers located in Pennsylvania.  Defendants are knowledgeable that this is occurring because they pay Amazon commissions and fees in order to participate in its Fulfilment by Amazon service.  Defendants have not taken any steps to prevent residents of Pennsylvania from purchasing products bearing the Lutron Trademarks from Defendants' Amazon Storefront.

**Lutron Has Suffered Substantial Harm as a Result of Defendants' Conduct**

149.     Lutron has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

150.     Lutron is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell materially different products bearing the Lutron Trademarks, causing continued irreparable harm to Lutron's reputation, goodwill, relationships, intellectual property, and brand integrity.

151.     Additionally, Lutron is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

152.     Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

153.     Defendants' willful violations of the Lutron Trademarks and continued pattern of misconduct demonstrate intent to harm Lutron.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

154.     Lutron incorporates the allegations set forth in the foregoing paragraphs.

155.     Lutron is the owner of the Lutron Trademarks.

156.     Lutron has registered the Lutron Trademarks with the United States Patent and Trademark Office.

157.     The Lutron Trademarks are valid and subsisting trademarks in full force and effect.

158.     Defendants willfully and knowingly used, and continue to use, the Lutron Trademarks in interstate commerce for purposes of selling non-genuine products bearing the Lutron Trademarks on the Internet without Lutron's consent.

159.     The products Defendants sell bearing the Lutron Trademarks are not authorized for sale by Lutron.

160.     Defendants' use of the Lutron Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Lutron Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Lutron.

161.     Defendants' use of the Lutron Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Lutron products.

162.     The products sold by Defendants are not, in fact, genuine Lutron products.  The products sold by Defendants are not genuine Lutron products and are materially different from genuine Lutron products because, among other reasons, they are ineligible for the Lutron Warranty, they are not subject to, do not abide by, and interfere with Lutron's quality control requirements that Authorized Sellers must follow, and do not come with the customer service benefits of genuine Lutron products.

163.     Defendants' unauthorized sale of materially different products bearing the Lutron Trademarks interferes with Lutron's ability to exercise quality control over products bearing its Lutron Trademarks because Lutron cannot audit Defendants to confirm that they are complying with Lutron's quality controls and close their account if they fail to comply.

164.    Defendants' unauthorized use of the Lutron Trademarks has materially damaged the value of the Lutron Trademarks, caused significant damage to Lutron's reputation and business relations, and infringed on the Lutron Trademarks.

165.    As a proximate result of Defendants' infringement, Lutron has suffered and continues to suffer damage to its business, goodwill, reputation, and profits, in an amount to be proven at trial.

166.    Lutron is entitled to recover its damages caused by Defendants' infringement of its Lutron Trademarks and disgorge Defendants' profits from its willful infringement and unjust enrichment.

167.    Lutron is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Lutron will suffer irreparable harm.

168.    Lutron is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Lutron Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition – 15 U.S.C. § 1125(a)

169.    Lutron incorporates the allegations set forth in the foregoing paragraphs.

170.    Lutron is the owner of the Lutron Trademarks.

171.    Lutron has registered the Lutron Trademarks with the United States Patent and Trademark Office.

172.    The Lutron Trademarks are valid and subsisting trademarks in full force and effect.

173.    Defendants have willfully and knowingly used, and continue to use, the Lutron Trademarks in interstate commerce for purposes of selling and advertising materially different products bearing the Lutron Trademarks without Lutron's consent.

174.    The products bearing the Lutron Trademarks that Defendants advertise and sell are not genuine Lutron products and are materially different from genuine Lutron products because they are not eligible for the Lutron Warranty, are not subject to, interfere with, and do not abide by Lutron's quality control requirements that Authorized Sellers must follow, and do not come with the customer service benefits of genuine Lutron products.

175.    Defendants' unauthorized advertisement and sale of materially different products bearing the Lutron Trademarks interferes with Lutron's ability to exercise quality control over products bearing the Lutron Trademarks because Lutron is unable to audit Defendants to confirm that they are complying with Lutron's quality control requirements and close their account if they fail to comply with Lutron's quality control requirements.

176.    Defendants' unauthorized sales of materially different products bearing Lutron Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants sell are genuine Lutron products that come with the Lutron Warranty and are subject to Lutron's quality controls when they are not.

177.    Defendants' unauthorized sales of materially different products bearing Lutron Trademarks are likely to cause confusion, cause mistake, or deceive consumers because they suggest that the products Defendants sell are sponsored or authorized by Lutron when they are not.

178.    Defendants' unauthorized sale of materially different products bearing Lutron Trademarks and use of Lutron Trademarks in advertising infringes on the Lutron Trademarks.

179.    Defendants' unauthorized sale of materially different products bearing Lutron Trademarks and unauthorized use of Lutron Trademarks in advertising have materially damaged the value of the Lutron Trademarks and caused significant damage to Lutron's business relations.

180.    As a proximate result of Defendants' actions, Lutron has and will continue to suffer damage to its business, goodwill, reputation, and profits, in an amount to be proven at trial.

181.    Lutron is entitled to recover its damages caused by Defendants' infringement of its Lutron Trademarks and disgorge Defendants' profits from its willful infringement and unjust enrichment.

182.    Lutron is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and unless Defendants are permanently enjoined, Lutron will suffer irreparable harm.

183.    Lutron is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
#### Common Law Unfair Competition

184.    Lutron hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

185.    Lutron is the owner of the Lutron Trademarks.

186.    Lutron has registered the Lutron Trademarks with the United States Patent and Trademark Office.

187.    The Lutron Trademarks are valid and subsisting trademarks in full force and effect.

188.    Defendants willfully and knowingly used, and continue to use, the Lutron Trademarks in commerce for the purpose of selling and advertising non-genuine products bearing the Lutron Trademarks without the consent of Lutron.

189.    The products bearing the Lutron Trademarks that Defendants advertise and sell are not genuine Lutron products because the products are not authorized for sale by Lutron, are not eligible for the Lutron Warranty, are not subject to Lutron's quality controls, do not come with the customer service benefits of genuine Lutron products, and are materially different from genuine Lutron products.

190.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Lutron Trademarks interferes with Lutron's quality controls and its ability to exercise quality control over products bearing the Lutron Trademarks.

191.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Lutron Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Lutron Trademarks suggests that the products Defendants offer for sale are covered by the Lutron Warranty and are subject to, and abide by, Lutron's quality controls when, in fact, they do not.

192.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Lutron Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Lutron Trademarks suggests that the products Defendants offer for sale are genuine Lutron products when, in fact, they are not.

193.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Lutron Trademarks is likely to cause confusion, cause mistake, or deceive consumers because

Defendants' use of the Lutron Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Lutron when, in fact, they are not.

194.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine Lutron products when, in fact, they are not.

195.    Defendants' unauthorized sale of products bearing the Lutron Trademarks and unauthorized use of the Lutron Trademarks in advertising infringes the Lutron Trademarks and constitutes unfair competition at common law.

196.    Defendants' unauthorized use of the Lutron Trademarks has materially damaged the value of the Lutron Trademarks, caused significant damage to Lutron's business relations, and infringed the Lutron Trademarks.

197.    As a proximate result, Lutron has suffered, and continues to suffer, immediate and irreparable harm.  Lutron has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

198.    Lutron is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**FOURTH CAUSE OF ACTION**
**Unfair Trade Practices – 73 P.S § 201-2 *et seq*.**

199.    Lutron hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

200.    Lutron is the owner of the Lutron Trademarks.

201.    Lutron has registered the Lutron Trademarks with the United States Patent and Trademark Office.

202.    The Lutron Trademarks are valid and subsisting trademarks in full force and effect.

203.    Defendants willfully and knowingly used, and continue to use, the Lutron Trademarks in interstate commerce, including in their product listings on Amazon, to advertise, promote, and sell non-genuine products bearing the Lutron Trademarks without Lutron's consent.

204.    Defendants' advertisements and promotions of products unlawfully using the Lutron Trademarks have been disseminated to the relevant purchasing public.

205.    The products Defendants advertise and sell are not genuine Lutron products because the products are not authorized for sale by Lutron, are not eligible for the Lutron Warranty, are not subject to Lutron's quality controls, and are materially different from genuine Lutron products.

206.    Defendants' unauthorized advertisements, promotions, and sales of products bearing the Lutron Trademarks interfere with Lutron's ability to exercise quality control over products bearing the Lutron Trademarks because Lutron is unable to audit Defendants to confirm they are complying with Lutron's quality control requirements and close their accounts if they fail to comply with Lutron's quality control requirements.

207.    The products Defendants advertise and sell are materially different from genuine Lutron products because they are not subject to, and interfere with, Lutron's quality controls.

208.    The products Defendants advertise, promote, and sell are materially different from genuine Lutron products because they do not come with the customer service benefits that accompany genuine Lutron products.

209.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising, promotion, and sale of the products Defendants offer for sale passes off goods that are not genuine Lutron products as if they were genuine Lutron products.

210.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Lutron Trademarks causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of Defendants' products because it suggests that the products are sponsored, approved, and certified by Lutron when, in fact, they are not.

211.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Lutron Trademarks causes likelihood of confusion or misunderstanding as to Defendants' products because it suggests that the products Defendants offer for sale are genuine and authentic Lutron products when, in fact, they are not.

212.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Lutron Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products Defendants sell are subject to Lutron's quality control requirements when, in fact, they are not.

213.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Lutron Trademarks misrepresents the sponsorship, approval, characteristics, uses, or benefits of Defendants' products because it suggests that the products Defendants offer for sale come with the customer service benefits that accompany genuine Lutron products when, in fact, they do not.

214.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Lutron Trademarks misrepresents the sponsorship, approval, status, affiliation, or connection of Defendants' products because it

suggests that the products Defendants offer for sale are sponsored by, approved by, authorized by, or otherwise connected with Lutron when, in fact, they are not.

215.    Defendants' use of the Lutron Trademarks in connection with the unauthorized advertising and sale of Lutron products is an unfair trade practice under 73 P.S. § 201-2.

216.    As a result of Defendants' unlawful actions, Lutron has suffered, and continues to suffer, irreparable harm.  Lutron also has and continues to suffer damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

217.    Pursuant to 73 P.S. § 201-8(a), Lutron is entitled to an award of actual damages and up to three times the same for each violation, plus costs and attorneys' fees.

218.    Lutron is also entitled to punitive damages because Defendants' conduct was malicious, wanton, willful, and oppressive toward Lutron, or exhibited a reckless indifference to the rights of Lutron.

## FIFTH CAUSE OF ACTION
### Tortious Interference with Business Relationships

219.    Lutron hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

220.    Lutron products are sold to the public exclusively through Lutron's network of Authorized Sellers.

221.    Lutron's Authorized Sellers are prohibited by the Lutron Rules from selling Lutron products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

222.    Defendants are not Authorized Sellers of Lutron Products.  Despite this, Defendants have sold and are continuing to sell a high volume of products bearing the Lutron Trademarks on

the Internet.  Absent theft, the only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.

223.    Thus, upon information and belief, Defendants have purchased Lutron products from Authorized Sellers for the purpose of reselling them on the Internet.

224.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to violate the Lutron Rules and has damaged Lutron's relationship with its Authorized Sellers.

225.    Defendants have known that the Lutron Rules prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, whom the Authorized Sellers know or have reason to know are going to resell the products.

226.    Defendants have known of this prohibition, among other reasons, because Lutron informed Defendants of this prohibition in a cease-and-desist letter it emailed and overnight mailed to Yadid and Leetronics on February 21, 2023.

227.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Lutron's relationships with its Authorized Sellers by continuing to induce Authorized Sellers to violate the Lutron Rules and sell products to Defendants that Defendants resold on the Internet.

228.    In interfering with Lutron's business relationships, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Lutron products from Authorized Sellers —and in so doing, damaged the business relationships between Lutron and its Authorized Sellers—so that Defendants could unlawfully infringe upon and materially damage the value of the Lutron Trademarks by reselling the products on the Internet, thereby committing an independent tort.

229.    Although Lutron does not yet know which specific Authorized Seller(s) have violated the Lutron Rules by selling to Defendants—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Lutron's claim of tortious interference.

230.    Defendants' actions have caused Lutron to suffer, and continue to suffer, substantial injury including loss of sales and damage to its existing and potential business relations.

231.    The injury to Lutron is immediate and irreparable, as Lutron's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

232.    Lutron is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Lutron prays for relief and judgment as follows:

A.    Judgment in favor of Lutron and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Lutron Trademarks;

ii)     Prohibiting the Enjoined Parties from using any of the Lutron Trademarks in any manner, including advertising on the Internet;

iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Lutron Trademarks;

iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Lutron Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Lutron's products, or any of the Lutron Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including, but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Lutron Trademarks which associate Lutron's products or the Lutron Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

53

vii)    Requiring the Enjoined Parties to take all action to remove the Lutron Trademarks from the Internet, including from the website www.amazon.com; and

viii)   Requiring the Enjoined Parties to destroy or return to Lutron all products bearing the Lutron Trademarks in their possession, custody, or control.

C.     An award of attorneys' fees, costs, and expenses.

D.     Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Lutron demands a trial by jury on all issues so triable.

Dated: August 25, 2023                      Respectfully submitted,

                                             **REILLY MCDEVITT & HENRICH, P.C.**

                                                    /s/ *Susan M. Valinis*
                                             By: _____
                                                    Susan M. Valinis, Esquire
                                                    Identification No. 86685
                                                    svalinis@rmh-law.com
                                                    Reilly, McDevitt & Henrich, P.C.
                                                    The Widener Building, Suite 410
                                                    One South Penn Square
                                                    Philadelphia PA  19107
                                                    Tel.: (215) 972-5200
                                                    *Attorneys for Plaintiff Lutron Electronics Co., Inc.*